UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Michaleen Josephs,                          CASE NO. 21-cv-749

                    Plaintiff,

v.

                                            **COMPLAINT**

Alberto Jose Marzan and Press Media
Group, Inc. dba VumaTV,

                    Defendants.

---

Plaintiff Michaleen Josephs ("Josephs") brings this Complaint against Defendants Alberto Jose Marzan ("Marzan") and Press Media Group, Inc. dba VumaTV ("Press Media Group") (collectively, "Defendants"), and states and alleges as follows:

### INTRODUCTION

1.      In June 2019, Josephs met Marzan. Marzan presented himself as a legitimate businessman. Unfortunately for Josephs, Marzan was not a legitimate businessman. Marzan was and remains a convicted con artist.

2.      Before meeting Josephs, Marzan developed experience raising funds for a business related to the Petters Ponzi scheme. Several years after Petters's conviction, Marzan himself was convicted of felony fraud in 2014 due to having unlawfully obtained over $25,000 from an insurance company. Also in 2014, but in a different matter, Marzan was charged in Minnesota state court with one count of theft by swindle. According to court documents, he lied to a woman to obtain $20,000 for a "start-up" company. Upon Marzan's inducement, the woman transferred money to a bank account that belonged to

Marzan personally, not a company bank account. Marzan then over a period of three months spent the entire $20,000 on himself—traveling, eating out, and paying for gym memberships and rent.

3.     Soon after he met Josephs, Marzan began to perpetrate a fraud on her. He claimed to Josephs, herself a successful businesswoman, that he had self-funded a company called Press Media Group. Marzan told Josephs that Press Media Group was soon to receive a large cash infusion. Specifically, Marzan represented that Press Media Group had secured $2.5 million in investment funding from a well-known investor relations firms. In fact, Marzan had not self-funded Press Media Group. And the investor relations firm had never so much as suggested that it would fund Press Media Group a nickel, let alone $2.5 million. Marzan made his misrepresentations because he was seeking to defraud Josephs and others.

4.     Apparently, the main lesson that Marzan learned from his 2014 theft-by-swindle charge was to funnel money for his lavish lifestyle directly through a corporate bank account instead of his personal bank account. Thus, when Marzan asked Josephs to invest in his company, he told her to send the money to Press Media Group's bank account as opposed to his personal one.

5.     In reliance on Marzan's false representations, Josephs loaned and wired Marzan and Press Media Group $150,000. She continued to fund Marzan and Press Media Group, providing Marzan with a corporate credit card and even paying Marzan's rent and furnishing the apartment in which he stayed. When Josephs became concerned about Marzan and Press Media Group's financial conditions and made it clear to Marzan that she

2

would no longer fund him and the company, he became defiant. When she requested that Marzan leave the apartment that she paid for and furnished, Marzan threatened her.

6.      Josephs eventually amended the initial $150,000 loan so that it in addition to a separate $47,000 promissory note had maturity dates of *December 13, 2020*. Josephs indicated that she intended to hold Press Media Group and Marzan responsible for the loans. On *December 4, 2020*, nine days before those promissory notes came due, Marzan audaciously went to court and obtained an *ex parte* temporary harassment restraining order *against* Josephs, which had the effect of preventing her from contacting him directly or indirectly to request the money due and payable.

7.      In total, including amounts wired and loaned, credit extended, and the $197,000 in promissory notes, Marzan and Press Media Group defrauded Josephs in an amount exceeding $300,000. Josephs was not the only victim of Marzan's fraudulent activity. Numerous individuals were suckered by Marzan.

8.      Marzan's pattern of fraud, which is predicated on multiple, criminal violations of federal and state law, constitutes a pattern of racketeering activity with the threat of future repetition by Marzan warranting judicial relief.

9.      Josephs recognizes that, even if faced with a civil judgment, Marzan will attempt to avoid collection of the amounts that he owes her, as he has in other civil and criminal matters. Josephs brings this action not only to seek recovery but also to protect the public from Marzan's unlawful conduct.

## THE PARTIES

10.     Michaleen Josephs is an individual who resides in Hennepin County, Minnesota.

11.     Alberto Marzan is an individual who, on information and belief, resides in Hennepin County, Minnesota.

12.     Press Media Group is a Delaware corporation with, on information and belief, its principal place of business in Hennepin County, Minnesota. Delaware state records reflect that it owes both annual reports and tax to Delaware.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over Count I and Marzan pursuant to 28 U.S.C. § 1331, because the claim arises under federal law.

14.     This Court has jurisdiction over Counts II through V and Press Media Group pursuant to 28 U.S.C. § 1367, because joinder is required and the counts are so related to Count I that they form the same case or controversy.

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), because both defendants reside in this judicial district and a substantial part of the events or omissions giving rise to this lawsuit occurred in this judicial district.

## FACTUAL ALLEGATIONS

### *Michaleen Josephs*

16.     Josephs was born and raised in a small town outside of Eau Claire, Wisconsin.

17.     She attended the University of Wisconsin – Madison, paying her own way through college.

4

18.    Josephs was interested in pursuing medical school, but she needed to pay off her undergraduate debt. So Josephs majored in finance and, after graduation, started working in corporate finance.

19.    Josephs excelled in the finance world. Within a few short years, she was the youngest head of finance in the Chicago office of Bain & Company, a leading global consulting firm.

20.    Shortly before Josephs anticipated transitioning to medical school, she and her husband welcomed their first child. Josephs chose to step away from work and focus on raising their children.

21.    Josephs and her husband eventually moved to Minnesota and welcomed two more children. Josephs primarily focused on raising their children. She was also a partner in an investment business, along with husband and one other person.

22.    In 2018, Josephs and her husband had an amicable divorce. She remains a partner in their shared business.

### *Josephs meets Marzan*

23.    On the evening of June 22, 2019, Josephs and Marzan met by chance in downtown Minneapolis.

24.    Marzan asked Josephs out on a date within a week.

25.    Marzan told Josephs that he owned a company, Press Media Group (then doing business as AfroLife TV), that was about to launch a streaming service.

26.    He claimed to be in Minnesota seven-to-ten days a month, filming a reality television show at a night club called Seven.

27.     On a date a few weeks later, Marzan expressed his interest in pursuing a relationship with Josephs, and the two started a romantic relationship.

### *Marzan's history of fraud and theft*

28.     Unfortunately for Josephs, she did not know that Marzan has a history of preying on women and fraudulently using their money to fund his lavish lifestyle and failing businesses.

29.     Marzan is a convicted fraudster.

30.     Marzan participated in raising funds for a business related to the Petters Ponzi scheme.

31.     After the revelation of the Petters Ponzi scheme, faced with what his lawyer later described as "some financial difficulty," Marzan in 2013 employed fraud to generate personal income.

32.     He submitted a fraudulent insurance claim, falsely reporting a diamond engagement ring as lost. But he did not actually possess the ring when he made the claim, and nor had he paid for it. Marzan's insurer paid him $25,924.25 under his homeowner's insurance policy for the "lost" ring.

33.     In December 2013, the State of Minnesota charged Marzan with two felony counts: (1) insurance fraud, in violation of Minn. Stat. § 609.611, subd. 1(a)(2); and (2) theft by swindle, in violation of Min. Stat. § 609.52, subd. 2(a)(4).

34.     In April 2014, Marzan agreed to plead guilty to the insurance-fraud count, in exchange for the state dismissing the theft-by-swindle count.

35.     Shortly thereafter, on June 1, 2014, Marzan was separately charged with theft

by swindle for different fraudulent conduct.

36.    According to those separate criminal charges, Marzan enticed a woman to invest $20,000 in an alleged start-up company and then "spent all $20,000 over a period of three months on personal expenses, including, traveling, eating out, paying his rent, etc."

37.    According to the criminal complaint, the alleged start-up in which the woman believed she was investing did not even yet formally *exist* when Marzan asked her to wire him $20,000.

38.    After Marzan agreed to pay full restitution to the victim, the State agreed to continue this second criminal case for dismissal.

39.    But Marzan did not initially comply with his conditional-dismissal payment obligations. It was only after the State recommenced the proceedings that Marzan finally paid the outstanding restitution to his female victim.

40.    As for the insurance-fraud matter, Marzan received a stay of imposition of the sentence and was ordered to pay $25,924.25 in restitution to the insurance company.

41.    Marzan again failed to pay. To the evident frustration of Washington County Community Corrections, his payments were "extremely sporadic." He even bounced multiple $25 checks in 2016. By March 2019, despite court-ordered restitution, Marzan had paid only *$550* in his own money toward the over $25,000 of restitution owed.

42.    As Washington County Community Corrections put it in a letter to the Washington County Court: Marzan "does not appear to take responsibility for the offense nor does he seem to care about his court ordered expectations."

43.    The Washington County Court revoked Marzan's stay of imposition in

March 2019.

### *Marzan fraudulently obtains $150,000 from Josephs*

44.     Undeterred by these charges and his fraud conviction, Marzan continued his pattern of fraud as he launched another start-up.

45.     Within a few weeks of starting their romantic relationship, Marzan began involving Josephs in Press Media Group.

46.     Marzan asked Josephs to join Press Media Group's advisory board.

47.     Marzan sent Josephs an investor slide deck to review.

48.     And, near the end of July 2019, Marzan asked Josephs to loan Press Media Group $150,000.

49.     Marzan told Josephs that he had $2.5 million in secured Series A funding from a well-known investor relations firm.

50.     Marzan's representation was false. The investor relations firm had not committed to providing *any* funding.

51.     Marzan told Josephs that he had completely self-funded the company, never taking on any debt.

52.     This was false—Press Media Group had already incurred significant debt.

53.     And Marzan told Josephs that a different business partner, Ken Sherman, had already offered to loan the money, and he simply didn't want to borrow the money from Sherman, given the interpersonal relationship.

54.     This was false—Marzan had borrowed $100,000 from Sherman one month earlier and promised to repay Sherman by August 13, 2019 at the latest.

55. Marzan made these false representations with the intention of inducing Josephs to rely on them and loan Press Media Group money.

56. And Josephs did so. Relying on Marzan's false representations, Josephs agreed to loan Press Media Group the $150,000.

57. At Marzan's direction, Josephs, using interstate wires on July 29, 2019, transmitted $150,000 from her bank account in Minnesota to Press Media Group's bank account located in California.

58. The loan was for 60 days, due and payable on September 30, 2019.

### Marzan pressures Josephs to lead an investment fund

59. On August 27, 2019, Marzan sent Josephs a text message in which he said that he wanted to discuss, among other things, an apartment, funding, and a Minneapolis office.

60. As it turned out, Marzan specifically wanted Josephs's help identifying office space for Press Media Group.

61. On the personal side, he also wanted Josephs's help finding an apartment. He claimed to have decided to move permanently to Minnesota because of Josephs and his business.

62. On August 28, Marzan followed up and sent Josephs what he described as the necessary "bridge use of funds" for the remainder of the year.

63. Marzan said they could address funding needs with a credit line, debt financing, or equity investors.

64. Marzan told Josephs that, if she led an investment fund, he would grant her

a 2% interest in Press Media Group.

65.     He attached a document that listed three "Term'd Investments," exceeding $5 million.

66.     One of the "Term'd Investments" was the 2.5 million from the investor relations firm.

67.     Josephs responded with a list of questions. One of them was: "Is the first 2.5M"—from the investor relations firm—"secured and when I say secured I mean signed on the dotted line."

68.     On September 3, Marzan responded by email. He knowingly and fraudulently said: "The first 2.5 is secured yes, that is coming from" the investor relations firm.

69.     Josephs believed Marzan.

70.     On September 5, for example, Josephs asked: "Do you really think you can't secure a LOC [letter of credit] now with the Series A at least half funded? I feel like that would not be an issue. When do those funds come through?"

71.     Again, the investor relations firm *never* agreed to provide *any* funds to Marzan or Press Media Group. Marzan's statements to the contrary were brazenly fraudulent to unlawfully obtain, at a minimum, $150,0000 from Josephs and, upon information and belief, others.

### *Marzan uses Josephs to fund his business and his delusional lifestyle*

72.     In September 2019, Marzan and Press Media Group started using Josephs's credit cards.

73.     Marzan promised to repay Josephs and use the credit cards for Press Media

Group business.

74.    Josephs let Marzan use her credit cards, relying on his repayment promise and believing that the supposedly secured $2.5 million investment would be coming soon.

75.    Marzan used the credit cards to, among other things, book plane and train tickets, and pay for lodging.

76.    On one occasion in early October, Marzan asked Josephs if she could "upfront" pay for an employee, Angela Pukal. Josephs agreed to do so, again in reliance on Marzan's misrepresentations.

77.    On October 7, Marzan sent Josephs a text with "the breakdown of what is needed this week," so that she could cover the costs. Some costs were related to the company. And some Marzan asked to be treated as "a personal loan."

78.    In late October 2019, Josephs signed a one-year lease for a condo in downtown Minneapolis for Marzan.

79.    Marzan promised to pay the rent. Josephs believed him and relied on that promise when she executed the lease.

80.    In early November 2019, Marzan asked if Press Media Group could use Josephs's American Express credit card as a corporate card, stating that VumaTv would "be responsible for pay [sic] for it," to which Josephs said yes, in reliance on the supposed $2.5 million in secured investment and Marzan's representations about himself and his business.

81.    Josephs received through the U.S. mail or an interstate commercial carrier an authorized-user American Express credit card in Marzan's name, but on Josephs's account,

for Marzan's use solely in connection with Press Media Group.

82.     Marzan requested that Josephs wire him money on multiple occasions, which she against did in reliance on the supposed $2.5 million in secured investment and Marzan's representations about himself and his business.

83.     On one occasion, on November 12, 2019, Marzan requested that Josephs transfer money to Marzan overseas for Marzan to use ostensibly for expenses related to Press Media Group.

84.     Starting in November, Josephs sent Marzan summaries of the credit card expenses, so that they could be reflected in the company's records.

85.     Marzan said he would review and classify the appropriate credit card expenses as business-related or personal.

86.     Marzan acknowledged that he had been using Josephs's credit cards and that she had loaned him money personally. He said "those are two separate thing," "but not really."

### *The promissory notes*

87.     In January 2020, Josephs decided to amend the $150,000 loan into a convertible promissory note, rather than receive immediate payment.

88.     Josephs and Press Media Group entered into the Amended and Restated Convertible Promissory Note ("Amended Promissory Note"), attached hereto as Exhibit A.

89.     The Amended Promissory Note remained for $150,000 principal, with an 8% interest rate on the unpaid principal, compounded annually. The $150,000 plus accrued interest was due and payable on December 13, 2020.

90.     The Amended Promissory Note included a provision for the optional conversion of the principal and accrued and unpaid interest to common stock of Press Media Group. At the same time, Josephs and Press Media Group entered into a second convertible promissory note ("Convertible Promissory Note"), attached hereto as Exhibit B, for $47,000, to repay Josephs for Press Media Group's use of Josephs's credit cards in the second half of 2019.

91.     The same terms that governed the Amended Promissory Note governed the Convertible Promissory Note, including the December 13, 2020 loan maturity date.

92.     In a personal guaranty dated January 16, 2020 ("Personal Guaranty"), attached hereto as Exhibit C, Marzan personally guaranteed both the Amended Promissory Note and the Convertible Promissory Note, along with "all present and future debts, liability and obligations" owed by Press Media Group to Josephs, including principal or interest.

93.     The Personal Guaranty provided for the payment of costs and expenses, including attorneys' fees, incurred if Josephs needed to commence a legal proceeding to enforce payment.

### Josephs stops funding Press Media Group and Marzan

94.     In 2020, Marzan continued to expect Josephs to fund Press Media Group and his personal life, which was concerning to Josephs.

95.     When Josephs raised her concerns with Marzan or attempted to get Marzan to commit to when and how she would be repaid, Marzan bullied her.

96.     Josephs stopped paying for Marzan's travel.

97.    In response, Marzan said that he simply did not travel because he couldn't afford to do so.

98.    He started forwarding Josephs information about trips and meetings that he would need to cancel because she wouldn't cover the expenses, including a trip to Los Angeles and a trip to Berlin.

99.    Josephs did not succumb to Marzan's coercive tactics.

100.    When it was clear that Josephs would no longer fund Marzan, Marzan removed Josephs from Press Media Group's board.

### *Marzan continues to bilk Josephs*

101.    Marzan and Josephs agreed that she would continue working with Press Media Group, but in only the limited capacity of identifying potential investors.

102.    Marzan agreed that he would not use Josephs's credit cards except for business purposes and, even then, would ask permission first.

103.    Josephs wanted to be sure that the debt owed to her by Press Media Group due to its continued use of some of her credit cards was reflected in the company's records.

104.    She asked Marzan how he would ensure that his personal loans and the loans to the company were accurately reflected in Press Media Group's records.

105.    Marzan told Josephs that he did not want Press Media Group's Chief Financial Officer to see his "personal charges," so he asked Josephs to send him the money owed, and said he would "remove the personal charges and leave the business ones in the file."

106.    Josephs continued to send Marzan details about the amount owed to her by

both Marzan and Press Media Group due to payments on Josephs's credit cards.

107.    Josephs relied on Marzan's promise to ensure that the business-related charges were reflected in Press Media Group's records.

108.    Marzan's indiscriminate charging on Josephs's cards did not cease, nor did he request permission in advance of making many charges, as he had said he would do. Josephs eventually had to cancel the credit cards that Marzan had access to, in order to get his charging activities to stop.

### *The eviction*

109.    Marzan never paid Josephs for any rent for the apartment that Josephs leased and furnished, despite his promise to do so.

110.    Since Josephs's name was on the lease, she continued to make payments.

111.    In June 2020, Josephs learned that new tenants were willing to move into the leased space early, saving her from being liable for rent through October 31, 2020.

112.    Josephs asked Marzan to "vacate the apartment by the end of July to allow the owners to terminate the lease." Josephs explained that she could no longer loan Marzan the money for the rent.

113.    Marzan responded that he would "stay until the end of the lease and no earlier," and would "figure out how to pay the rent until then."

114.    On July 7, Josephs responded: "I need to make myself clear . . . . This is my official notice to you that I plan to terminate the lease as of July 31."

115.    On July 10 and again on July 23, Josephs sent Marzan emails regarding the lease termination.

116.    When Josephs sent Marzan the details about the movers who would be arriving to move her furniture, Marzan responded: "Let's see how empty your promises continue to be. I dare you to come inside here."

117.    Marzan did not vacate the apartment on July 31, 2020.

118.    Marzan did not vacate the apartment until the landlord took him to housing court and commenced an eviction proceeding.

119.    When Marzan did finally vacate the apartment, he took Josephs's furniture with him, which Marzan agreed had cost a total of $17,937.19. Marzan promised to pay Josephs back for the furniture by September 29, 2021, which, as discussed below, would prove to be another lie.

### *Marzan's trail of debts and lawsuits*

120.    Marzan's penchant for living beyond his means and deceit about his companies left behind a trail of victims beyond the victims in his criminal cases.

121.    First, there were his unpaid employees, at least one of whom has gone to court and obtained a default judgment against Marzan and Press Media Group for owed wages. The only wages she received were those fronted by Josephs at Marzan's request.

122.    Next there were the unpaid creditors, such as Sherman. Sherman too went to court and obtained a default judgment against Marzan, totaling $132,790.20.

123.    Then there were the unpaid business partners and contractors, who provided valuable services to Press Media Group, only to be conned or bullied out of payment.

124.    And, of course, there was Josephs.

125.    Even Marzan acknowledged that Josephs is one of his victims and expressed

remorse for his fraud.

126. On February 19, 2020 Marzan sent Josephs a long string of sometimes incoherent text messages, in which he stated, among other things:

> I am angry at myself for letting you in but not because you did not or do not deserve it because you are a good women [sic] . . . .
>
> I am angry because I took your money.
>
> . . . [T]ook your investment and took your loans to get me situation here where I am.
>
> I am angry because I didn't ring the bell sooner when I should have both personally and professionally.

127. Marzan never paid for a penny of the apartment rent, despite his promise to do so. Josephs paid $27,950.00 in security deposit and rent for Marzan.

128. Marzan never paid for the apartment furniture, which totaled $17,937.19.

129. Marzan never repaid the numerous business and personal expenses fronted by Josephs, which, as of the filing of this Complaint, include $20,600 in wire transfers, $63,713 in credit card charges and fees, and another $2,536.34 in miscellaneous expenses.

130. Of the credit charges, $30,921.61 were on the authorized-user American Express credit card that Marzan purportedly used for Press Media Group expenses.

131. And Marzan never paid for the two promissory notes, totaling $197,000, exclusive of interest.

### Marzan abuses the court system to avoid Joseph recovering funds from him

132. Josephs communicated to Marzan that she recognized that she had been defrauded by him.

133. Marzan knew that Josephs sought the return of the money that Marzan had

fraudulently procured from her.

134.     Conveniently, less than ten days before the promissory notes totaling $197,000 came due, Marzan sought a court order that *prevented* Josephs from contacting him to request payment, by obtaining an *ex parte* temporary harassment restraining order ("THRO").

135.     Marzan instituted the THRO action for no legitimate purpose but instead to prevent Josephs from seeking to recover the amounts immediately owed to her, thereby acting with an ulterior purpose and using the judicial process to accomplish an improper result.

136.     Even after obtaining the *ex parte* temporary harassment order, Marzan continued to charge one of Josephs's credit cards.

### Marzan's next start-up vehicle: "Jupiter Rising Film"

137.     Marzan recently has launched yet another start-up company: Jupiter Rising Film.

138.     Presently Marzan describes himself, in part, as follows in website content for Jupiter Rising Film:

> A successful company founder, executive, and entrepreneur, Alberto Marzan's award-winning career spans media, technology, marketing, and philanthropy. Now, as co-founder and Chief Executive Officer of Jupiter Rising Film and founder of VumaTV, Marzan brings his 20-year track-record of driving global impact and innovation to the streaming service industry. The lead architect of the company's mission and vision, Marzan— who has worked in more than 50 countries as a corporate turnaround chief executive and entrepreneur.

139.     Marzan does not appear to disclose his criminal fraud history in any publicly available materials related to Jupiter Rising Film.

18

140.    Upon information and belief, Marzan continues to seek funding from various sources in connection with his new so-called venture.

## CAUSES OF ACTION

### Count I
### (Civil RICO, 18 U.S.C. § 1964 – Against Defendant Marzan)

141.    Josephs realleges, as if fully set forth herein, all allegations in Paragraphs 1 to 140 above.

142.    An ongoing and continuing enterprise of actual and/or fraudulent start-up legal entities controlled by Marzan, including, but not limited to, Press Media Group, exists.

143.    Marzan was associated with the enterprise by virtue of his controlling positions.

144.    Marzan directly participated in the conduct of the affairs of the enterprise, including, but not limited to, by unlawfully procuring funding from unwitting victims.

145.    Marzan participated in the enterprise through a pattern of racketeering activity, which consisted of the knowing and willful commission of more than two racketeering acts.

146.    This racketeering activity included multiple instances of wire and mail fraud victimizing Josephs who is only one of Marzan's victims.

147.    On or about the dates set forth below, in and/or purposely directed at the State and District of Minnesota, and for the purpose of executing a scheme or artifice to defraud, Marzan did knowingly cause to be transmitted in interstate commerce numerous writings, signals, and sounds, including the wire communications described below:

| Date | Wire communication |
|------|--------------------|
| July 29, 2019 | Wire transfer of $150,000 from Josephs's bank account in Minnesota to Press Media Group's bank account in California. |
| September 10, 2019 through November 16, 2019 | Various electronically transmitted payments by Josephs totaling $47,000 to pay various credit-card accounts controlled by Marzan ostensibly for charges related to Press Media Group. |
| November 12, 2019 | Wire transfer of $500 from Josephs via a Western Union transmission from Minnesota to Marzan in Nigeria ostensibly for Marzan's work for Press Media Group in Nigeria. |
| November 22, 2019 | Wire transfer of $2,300 from Josephs's bank account in Minnesota to Press Media Group's bank account in California. |

148.    On or about November 22, 2019, in and/or purposely directed at the State and District of Minnesota and elsewhere, and for the purpose of executing a scheme or artifice to defraud, Marzan did knowingly cause to be sent, delivered, and moved by the United States Postal Service and/or an interstate commercial carrier an authorized-user American Express credit card in Marzan's name but on Josephs's account for Marzan's use solely in connection with Press Media Group.

149.    Marzan accordingly violated 18 U.S.C. § 1962.

150.    A threat of repetition of Marzan's unlawful behavior exists given the years-long pattern of racketeering activity in which Marzan has engaged, which has affected multiple victims in various but related matters.

151.    As a direct and proximate result of Marzan's violation of 18 U.S.C. § 1962, Josephs has suffered damages in an amount to be determined at trial.

## Count II
### (Fraud – Against All Defendants)

152.    Josephs realleges, as if fully set forth herein, all allegations in Paragraphs 1 to 140 above.

153.    Defendants made false representations of past or existing material facts.

154.    Defendants knew the falsity of their representation.

155.    Defendants made these false representations with the intention to induce Josephs to act in reliance thereon.

156.    Josephs did act in reliance on Defendants' false representation.

157.    As a direct and proximate result of Defendants' fraud, Josephs has suffered damages in an amount to be determined at trial.

## Count III
### (Breach of Contract – Against All Defendants)

158.    Josephs realleges, as if fully set forth herein, all allegations in Paragraphs 1 to 140 above.

159.    Josephs and Defendants formed multiple contracts that required Defendants to repay Josephs for the amount loaned to Press Media Group and Marzan.

160.    Josephs performed her end of the contracts.

161.    Marzan and Press Media Group have materially breached the contracts.

162.    As a direct and proximate result of Defendants' breaches, Josephs has suffered damages in an amount to be determined at trial.

## Count IV
### (Promissory Estoppel – Against All Defendants)

163.    Josephs realleges, as if fully set forth herein, all allegations in Paragraphs 1 to

140 above.

164.     Alternatively and/or in addition to the breaches of contract, Defendants made multiple clear and definite promises to Josephs that they would repay her for money loaned and advanced.

165.     It was foreseeable to Defendants that Josephs would rely on their promises, and Josephs did rely on their promises, to her detriment.

166.     Defendants' promise must be enforced to prevent injustice.

167.     As a direct and proximate result of Defendants' wrongful conduct, Josephs has suffered damages in an amount to be determined at trial.

### Count V
### (Abuse of Process – Against Defendant Marzan)

168.     Josephs realleges, as if fully set forth herein, all allegations in Paragraphs 1 to 140 above.

169.     Marzan used the THRO proceeding for an ulterior purpose, namely to resist Josephs's stated intention to collect from Marzan what she was owed by him as well as her stated intention to have him held accountable for his fraudulent conduct.

170.     The legal process was used to accomplish an unlawful end for which it was not designed.

171.     As a direct and proximate result of Marzan's abuse of process, Josephs has suffered damages in an amount to be determined a trial.

### JURY TRIAL DEMANDED

Josephs demands a jury trial as to all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Josephs demands judgment as follows:

1. Finding in Josephs's favor, and against Defendants, on all claims.

2. Awarding Josephs the full measure of damages permitted by law, including treble damages for Count I.

3. Ordering Marzan to divest himself of any interest, direct or indirect, in the enterprise.

4. Imposing reasonable restrictions on the future activities of Marzan, including, but not limited to, prohibiting Marzan from engaging in the same type of endeavor as the enterprise engaged in.

5. Ordering dissolution of the enterprise, making due provision for the rights of innocent persons.

6. Awarding Josephs her attorneys' fees associated with this matter and the THRO proceeding.

7. Awarding Josephs such other and further legal and equitable relief as the Court may deem appropriate.

Date:  March 22, 2021

 s/Matthew D. Forsgren

**FORSGREN FISHER MCCALMONT**
**DEMAREA TYSVER LLP**
Matthew D. Forsgren, Reg. No. 0246694
Caitlinrose H Fisher, Reg. No. 0398358
Capella Tower
225 South 6th Street, Suite 1750
Minneapolis, MN 55402
(612) 474-3300
mforsgren@forsgrenfisher.com
cfisher@forsgrenfisher.com

*Attorneys for Plaintiff Michaleen Josephs*