**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

MICHALEEN JOSEPHS,

                Plaintiff,

v.

ALBERTO JOSE MARZAN and PRESS
MEDIA GROUP, INC. d/b/a VumaTV,

                Defendants.

Civil No. 21-0749 (JRT/DTS)

**MEMORANDUM OPINION AND ORDER
GRANTING DEFAULT
JUDGMENT**

---

Caitlinrose H. Fisher and Matthew D. Forsgren, **FORSGREN FISHER
MCCALMONT DEMAREA TYSVER LLP**, 225 South Sixth Street, Suite 1750,
Minneapolis, MN 55402, for plaintiff.

Alberto Jose Marzan, *pro se* defendant.

Press Media Group, Inc., *pro se* defendant.

Plaintiff Michaleen Josephs brought this action against Defendants Alberto Jose

Marzan and Press Media Group, Inc. ("PMG") in connection with a series of investment

loans Josephs made to the Defendants and other payments Josephs made for Defendants'

benefit. Josephs filed a Motion for Default Judgment against both defendants requesting

monetary damages and equitable relief. The Court will grant the Motion for Default

Judgment and will award damages and equitable relief.

## BACKGROUND

On March 22, 2021, Josephs filed a Complaint against both Defendants. (Compl., Mar. 22, 2021, Docket No. 1.) The Complaint alleges that Marzan induced Josephs to loan money to and invest in PMG and pay other expenses for Marzan and PMG conditioned on a series of promises that she would be paid back. (*Id.* ¶¶ 45–58, 60–93, 101–19.) Josephs and PMG entered into two written promissory notes guaranteeing repayment of $150,000 that Josephs wired PMG as a loan and of $47,000 in expenses Josephs had paid for PMG's benefit. (*Id.* ¶¶ 88–91; Compl., Exs. A–B.) Marzan also personally guaranteed these notes in a written contract that also allowed Josephs to recover attorney fees and costs associated with enforcing payment. (Compl. ¶¶ 92–93; Compl., Ex. C.) Josephs also allowed Defendants to use her credit cards, wired money to them, and paid other expenses for their benefit. (Compl. ¶¶ 72–76, 80–83, 106, 108.)

The Complaint alleges that instead of a legitimate investment Marzan and PMG defrauded Josephs. (*See, e.g.*, *id.* ¶¶ 3–8, 44–57, 68–71, 146–157.) For example, Josephs wired PMG a $150,000 loan—later secured by a promissory note—after Marzan represented to her that PMG had secured $2.5 million in funding from other investors and had never taken on debt. (*Id.* ¶¶ 48–49, 51, 56–58.) These representations were false. (*Id.* ¶¶ 50, 52–54.) In furtherance of this fraud, Marzan caused the use of both interstate wires and mail. (*E.g.*, *id.* ¶¶ 147–48.)

The Complaint further alleges that Marzan has a history of engaging in various fraudulent schemes beginning at least by 2013. (*Id.* ¶¶ 31–37.) This includes insurance fraud, another investment-related fraud, and defrauding Josephs and other victims in connection with the scheme alleged in this case. (*Id.* ¶¶ 7, 32, 36, 71, 146.)

In addition to the debts owed to Josephs, the Complaint alleges that Marzan and PMG have a series of unpaid debts, default judgments, and court-ordered restitution awards. (*Id.* ¶¶ 41, 121–23.) According to the Complaint, Marzan has avoided criminal penalties on two occasions on the condition of repaying victims but has failed to fully do so in one case and only repaid another defrauded investor when criminal prosecution resumed after Marzan failed his payment obligations. (*Id.* ¶¶ 32–41.) Outside the Complaint, Josephs documented 8 default judgments from 2014 to 2020 against Marzan, PMG, and another company associated with Marzan. (Decl. of Matthew Forsgren ("1st Forsgren Decl."), Exs. C–J, Aug. 19, 2021, Docket No. 13.)[1]

Marzan has created a new company: Jupiter Rising Film. (Compl. ¶ 137.) The Complaint alleges that Marzan and Jupiter Rising Film seek funding without disclosing Marzan's history of fraud. (*Id.* ¶¶ 139–40.)

Josephs alleges that Marzan sought and received a temporary harassment restraining order against Josephs to prevent her from seeking repayment of the money

---

[1] The Court may take judicial notice of these public judicial opinions and records. Fed. R. Evid. 201; *Stutzka v. McCarville*, 420 F.3d 757, 760 n.2 (8th Cir. 2005).

Josephs was owed. (*Id.* ¶¶ 134–35.) Josephs moved to quash the restraining order and the parties engaged in two discovery conferences and an evidentiary hearing with witnesses that resulted in the Minnesota state district court vacating the restraining order. (1st Forsgren Decl. ¶ 23, Ex. O.) Until the restraining order was lifted, Josephs was unable to seek recovery of the various debts she was owed. (Compl. ¶¶ 6, 134.)

The damages alleged in the Complaint as demonstrated by supporting documentation Josephs filed with the Court show that Josephs loaned PMG or paid for expenses on behalf of PMG totaling $266,233.36 from the written and oral contracts Josephs made with the Defendants over the course of the scheme. Josephs provided a $150,000 loan and paid $47,000 in expenses that were later guaranteed by two promissory notes entered into on January 16, 2020 at 8% interest, compounded annually with a December 13, 2020 maturity date. (*Id.* ¶¶ 87–90; Compl., Exs. A–B, Mar. 22, 2021, Docket No. 1-1.) She made wire transfers and Western Union transfers totaling $20,600. (Compl. ¶ 129; Decl. of Michaleen Josephs ("Josephs Decl.") ¶¶ 9–13, Ex. C at 2–10, Nov. 1, 2021, Docket No. 20; *see also* Josephs Decl., Ex. B at 2, Exs. D–E.) PMG and Marzan used her credit cards to charge a total of $46,097.02 in expenses. (2nd Mem. Supp. Mot. Default J. at 14–15, Nov. 1, 2021, Docket No. 18; Josephs Decl. ¶¶ 15–18, Ex. B at 2–3, Ex. F.)[2] Josephs also incurred $2,536.34 in miscellaneous expenses for PMG and Marzan.

---

[2] Paragraph 17 of the affidavit Josephs filed in support of her damages indicates that the Defendants are liable for $5,128.43 in 2019 credit card expenses not reflected in the $47,000 promissory note. (Josephs Decl. ¶ 17.) As Exhibit B shows $5,128.45 and all calculations based

(Josephs Decl. ¶¶ 19–25, Ex. B at 3, Exs. G–H.)  Josephs has not been repaid any of these loans or expenses.  (Compl. ¶¶ 129–31.)

In addition to these loans and expenses PMG and Marzan induced Josephs to pay as investment and business expenses, the Complaint alleges that Marzan sought her help securing, paying for, and furnishing an apartment for his personal use conditioned on an agreement that he would pay Josephs back.  (Compl. ¶¶ 61, 109–10, 119.)  Marzan never paid for the apartment and took the furniture without paying Josephs for it.  (*Id.* ¶¶ 109, 119, 127–28.)  Supporting documentation shows that Josephs paid $25,155.00 in rent, a $3,000 security deposit which she did not recover, and $17,937.19 furnishing the apartment for a total of $46,092.19.  (Josephs Decl. ¶¶ 27–28, Exs. B, I–J, M.)

Finally, Josephs has also incurred significant attorney fees and costs seeking to recover in this case as well as opposing the harassment restraining order.  (Mem. Supp. Mot. Default J. at 41, Aug. 19, 2021, Docket No. 12; 2nd. Decl. of Matthew Forsgren ("2nd Forsgren Decl.") ¶¶ 8–13, Nov. 1, 2021, Docket No. 19.)  Josephs incurred $125,442.60 in attorney fees and costs opposing the restraining order and $58,284.50 through October 2021 in attorney fees and costs in this lawsuit.[3]  (2nd Forsgren Decl. ¶¶ 10, 13, Exs. 1–3.)

_____

on these expenses in Josephs's filings arrive at a sum using $5,128.45, the Court will use $5,128.45 for these expenses.

[3] In her supplemental brief and in the supporting affidavit from Matthew Forsgren, Josephs asserts that she has incurred $58,584.50 in fees and costs prosecuting this case through October 31, 2021.  (2nd Mem. Supp. Mot. Default J at 15; 2nd Forsgren Decl. ¶ 13.)  The sum of the fees and expenses documented in Exhibit 3 of the Forsgren affidavit is $51,975.50.  (2nd Forsgren Decl. Ex. 3.)  When added to the $6,309 in fees and expenses incurred in October 2021

Both Defendants were served on April 15, 2021.  (Summons, May 19, 2021, Docket No. 4.)  Neither Defendant made an appearance, answered, or filed any motion in the case.  The clerk entered default against both Defendants on May 27, 2021.  (Entry of Default, May 27, 2021, Docket No. 8.); *see also* Fed. R. Civ. P. 55(a).  On August 19, 2021, Josephs filed a Motion for Default Judgment against both Defendants.  (Mot. Default J., Aug. 19, 2021, Docket No. 10.).  At the Motion Hearing on October 14, 2021, the Court ordered additional documentation of the requested monetary damages and briefing on the requested equitable relief.  (Min. Entry, Oct. 14, 2021, Docket No. 17.)  Josephs submitted this documentation and briefing on November 1, 2021.  (2nd Mem. Supp. Mot. Default J.; 2nd Forsgren Decl.; Josephs Decl.)

## DISCUSSION

### I.    CAUSES OF ACTION

"Upon default, the factual allegations of a complaint (except those relating to the amount of damages) are taken as true, but it remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit mere conclusions of law."  *Murray v. Lene*, 595 F.3d 868, 871 (8th Cir. 2010) (quotation omitted).  The Court concludes that the Complaint has properly alleged facts sufficient to support a viable cause of action on each claim.

---

(*Id.* ¶ 12), the documentation shows that Josephs has incurred $58,284.50 in fees and expenses. Therefore, the Court will use the $58,284.50 amount substantiated in the record.

Count I asserts a Racketeering Influenced and Corrupt Organizations ("RICO") Act claim against Marzan under 18 U.S.C. §§ 1962(c), 1964. A RICO claim must have four elements: (1) an enterprise (2) engaged in racketeering activity (3) forming a pattern of such activity and (4) conduct of the defendant in support of the enterprise. *Crest Const. II, Inc. v. Doe*, 660 F.3d 346, 353 (8th Cir. 2011).

"Three elements must be proven to show that a RICO enterprise existed: (1) a common purpose that animates the individuals associated with it; (2) an ongoing organization with members who function as a continuing unit; and (3) an ascertainable structure distinct from the conduct of a pattern of racketeering." *United States v. Lee*, 374 F.3d 637, 647 (8th Cir. 2004). The facts in the Complaint demonstrate a common purpose among Marzan and various entities including PMG of enriching Marzan and paying his personal expenses rather creating actual investment opportunities and legitimate businesses. The undisputed facts also demonstrate there is an ongoing organization with Marzan and various corporate entities functioning for this common purpose. Finally, they show that the structure is sufficiently distinct from the conduct and from Marzan. The entities are distinct from the conduct because they would still exist as businesses even if "the slate were wiped clean of the underlying racketeering activity." *See Handeen v. Lemaire*, 112 F.3d 1339, 1352 (8th Cir. 1997). And the enterprise is sufficiently distinct from Marzan because he is distinct from PMG, a corporate entity with its own legal status and rights. *See Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158,

163–65 (2001).   Therefore, Josephs adequately establishes the existence of a RICO enterprise to satisfy this element.

Racketeering activity is defined to include a long list of federal and state offenses including mail and wire fraud.  18 U.S.C. § 1961(1); *United States v. Haynie*, 8 F.4th 801, 804 (8th Cir. 2021).   The Complaint alleges that Marzan's RICO enterprise knowingly intended to defraud Josephs and others to obtain money and property for Marzan's enrichment using mail and wire communications in interstate commerce in violation of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud).  The Complaint sufficiently establishes  the enterprise has engaged in racketeering activity.

The RICO pattern element requires "two or more related acts of racketeering activity that amount to or pose a threat of continued criminal activity.  To satisfy [this] element, therefore, a plaintiff must provide evidence of multiple predicate acts occurring over a substantial period of time." *Crest Const. II*, 660 F.3d at 356 (quotations omitted). The Complaint alleges a pattern of fraud including at least (1) insurance fraud in 2013; (2) a similar investment-related fraud targeting another individual in 2014; and (3) multiple acts of fraud targeting Josephs beginning in July 2019.  The Complaint, therefore, alleges the pattern of racketeering activity RICO element.

Finally, the conduct element refers to an individual's conduct within the RICO enterprise.  *Handeen*, 112 F.3d at 1347.   Hence, the conduct element "authorize[s] recovery only against individuals who participate in the operation or management of the

enterprise itself." *Id.* (quotation omitted).  The Complaint alleges that Marzan was involved in operating the various entities including PMG set up for the enterprise to defraud people including Josephs.  Therefore, the Complaint meets this element.  With all four RICO elements met, the Court concludes that the uncontested facts of the Complaint adequately establish a viable RICO Act claim against Marzan.

Count II asserts a fraudulent representation claim against both Defendants.  Under Minnesota law, the elements of this claim are (1) a false representation of a past or existing material fact; (2) made with knowledge of its falsity or without knowledge of whether it was true or false; (3) with the intent to induce reliance; (4) actual reliance; and (5) damages as a result of the reliance. *Hoyt Props., Inc. v. Prod. Res. Grp., LLC*, 736 N.W.2d 313, 318 (Minn. 2007).  The Complaint alleges (1) Marzan, on behalf of himself and on behalf of PMG while acting within the scope of his authority, made several false representations (2) Marzan and PMG knew to be false (3) with the intent to induce Josephs to loan PMG money and pay expenses for the Defendants in reliance on those false representations and that (4) Josephs actually relied on those representations and wired money to and paid expenses for the Defendants (5) that she has not been repaid as promised—damages as a result of her reliance.  Therefore, the Court concludes that that the uncontested facts of the Complaint adequately establish a viable fraudulent misrepresentation claim against both Defendants.

Count III asserts a breach of contract claim against both Defendants.   Under Minnesota law, the elements of this claim are (1) formation of a contract; (2) performance by the plaintiff of any condition precedent to the defendant's performance; and (3) breach of the contract by the defendant.  *Lyon Fin. Servs., Inc. v. Ill. Paper & Copier Co.*, 848 N.W.2d 539, 543 (Minn. 2014).   The Complaint alleges that Josephs entered into multiple written and oral contracts with the Defendants.  Josephs provided the Court with the signed, written contracts for two promissory notes with PMG and Marzan's signed personal guaranty of those contracts.  She also provided the Court a detailed accounting of the loans and payments she made based on these contracts.  Neither Defendant has paid Josephs any amount despite their contractual obligations.   Therefore, the Court concludes that that the uncontested facts of the Complaint adequately establish a viable breach of contract claim.[4]

Count V asserts an abuse of process claim against Marzan.  Under Minnesota law, the elements of this claim are "the existence of an ulterior purpose and the act of using the process to accomplish a result not within the scope of the proceedings in which it was issued, whether such result might otherwise be lawfully obtained or not."  *Kellar v. VonHoltum*, 568 N.W.2d 186, 192 (Minn. Ct. App. 1997) (citing *Hoppe v. Klapperich*, 28

---

[4] The Complaint also alleges a promissory estoppel claim (Count IV) in the alternative to the breach of contract claim.  Because the Court concludes that the Complaint satisfies the requirements for breach of contract and the damages Josephs suffered under the promissory estoppel claim are identical to those as the breach of contract claim, the promissory estoppel claim is moot as an alternative theory of recovery.

N.W.2d 780, 786 (Minn. 1947)); *accord Strei v. Blaine*, 996 F. Supp. 2d 763, 793 (D. Minn. 2014).  The ulterior purpose must be something other than "the very purpose for which [the process] is intended."  *Strei*, 996 F. Supp. 2d at 794.  The plaintiff must also suffer an injury to the plaintiff's person or property that is more than an indirect injury to the plaintiff's business or "good name."  *Hoppe*, 28 N.W.2d at 787.  The Complaint alleges that Marzan sought a harassment restraining order for the purpose of and then used it to prevent Josephs from recovering money she was lawfully entitled to—something that is outside the purpose and scope of a Minnesota harassment restraining order.  *See* Minn. Stat. § 609.748; *Welsh v. Johnson*, 508 N.W.2d 212, 214 (Minn. Ct. App. 1993).  As a result, she was unable to seek recovery of debts owed and had to incur significant costs vacating the restraining order so that she could continue seeking repayment, a direct injury to her property.  *See Hoppe*, 28 N.W.2d at 787.  Therefore, the Court concludes that that the uncontested facts of the Complaint adequately establish a viable abuse of process claim.

## II.   MONETARY DAMAGES

Once the Court determines that it is appropriate to grant default judgment, the Court must still determine the proper relief to grant.  Even if the defendant's liability is established through a default judgment, the plaintiff must prove actual damages to "a reasonable degree of certainty."  *Everyday Learning Corp. v. Larson*, 242 F.3d 815, 819 (8th Cir. 2001); *see also Murray*, 595 F.3d at 871.  The Court need not hold an evidentiary

hearing on damages if the damages are "readily discernable on the basis of undisputed evidence in the record." *Cutcliff v. Reuter*, 791 F.3d 875, 883 (8th Cir. 2015).

Because the uncontested Complaint has established viable claims, the Court must decide the proper relief to grant. Josephs requests (1) monetary damages against both Defendants for her actual losses, (2) treble damages against Marzan for any damages tied to the RICO claim, and (3) equitable relief against Marzan under the RICO Act. Because the record now substantiates these damages, the Court will award Josephs monetary damages against both PMG and Marzan.

The Court will not conduct an evidentiary hearing on the damages because they are readily discernable from the affidavits and documentary evidence now on the record. *See Cutcliff*, 791 F.3d at 883; *see also Quality Carriers, Inc. v. Randolph*, No. 06-1170, 2007 WL 2027281, at *1 (N.D.N.Y. July 9, 2007) ("[T]he court may rely on detailed affidavits and documentary evidence to fix damages after a default judgment has been entered.")

### A.    Business Loan Related Damages

With the additional documentation, Josephs has adequately substantiated the requested monetary damages related to her investment in PMG, including RICO treble damages against Marzan. The record shows that PMG entered into two promissory notes—one for $150,000 and one for $47,000—with Josephs on January 16, 2020 with a maturity date of December 13, 2020. Interest accrues on these promissory notes at a rate of 8% per annum, compounded annually. Marzan also personally guaranteed these

notes.  Josephs has also substantiated the other business-related damages.  The record shows that she transferred a total of $20,600 through wire transfers and Western Union transfers.  It also substantiates that Josephs incurred $46,097.02 in credit card expenses and $2,536.34 in miscellaneous expenses on behalf of Defendants.  The uncontested facts in the Complaint establish that neither Defendant has repaid any amount.  Therefore, the Court will award Josephs $266,233.36 in damages, plus interest on the promissory notes, for Counts II and III from PMG and Marzan, jointly and severally.  Because these damages are included in the RICO claim, Josephs is also entitled to treble damages from Marzan on these damages for Count I.  *See* 18 U.S.C. § 1964(c).  The Court will award Josephs $532,466.72, plus treble damages interest on the promissory notes, against Marzan alone.

### B.    Apartment Related Damages and Attorney Fees and Costs

In addition to the business-related damages for which both Defendants are liable, Marzan alone is individually liable for certain damages.

The uncontested facts in the Complaint demonstrate that Josephs rented and furnished an apartment for Marzan's personal use conditioned on an agreement to repay Josephs.  Because nothing indicates—and Josephs does not allege—that PMG is responsible for these costs, Marzan is solely liable for these expenses and these expenses are not related to the RICO enterprise therefore treble damages are not available.  The record shows that Josephs incurred apartment and furniture-related expenses in the

-13-

amount of $46.092.19.  The uncontested facts in the Complaint establish that Marzan has not repaid any amount related to these expenses.  Therefore, the Court will award Josephs an additional $46,092.19 for Counts II and III against Marzan alone.

### C.    Attorney Fees and Costs

Josephs also seeks recovery from Marzan alone of the attorney fees and costs she has incurred both in prosecuting this action and in responding to the restraining order.  Because Josephs has demonstrated that she is legally entitled to the fees and costs and the expenses are reasonable, the Court will also award these damages against Marzan.[5]

Josephs may recover the costs of this case under two theories.  First, RICO includes a fee shifting provision allowing private plaintiffs that successfully bring a civil RICO case to recover "the cost of the suit, including a reasonable attorney's fee" from the defendant.  18 U.S.C. § 1964(c).  Because the Complaint sufficiently establishes a civil RICO claim against Marzan, Josephs is entitled to the cost of her suit.  Second, under Minnesota law, attorney fees are recoverable in a civil action if permitted by a specific contract. *Roach v. Cnty. of Becker*, 962 N.W.2d 313, 322–23 (Minn. 2021).  The guaranty Marzan signed securing the two promissory notes also permitted Josephs to recover her costs and expenses including attorney fees as permitted under Minnesota law in an action to

---

[5] Josephs does not seek to recover costs and attorneys from PMG because PMG is not included in the RICO or abuse of process claims and, unlike Marzan's personal guaranty, the promissory notes did not include a provision allowing Josephs to recover expenses incurred enforcing the notes.  Therefore, these damages are not awarded against PMG.

enforce the guaranty.   Therefore, the Court will award Josephs her costs including reasonable attorney fees in prosecuting this case.

Josephs may also recover her costs responding to the harassment restraining order under the abuse of process claim.   The Minnesota Supreme Court has directed courts to look at a variety of sources to determine the damages available to plaintiffs in abuse of process cases.   *Hoppe*, 28 N.W.2d at 787 n.2.   Under these sources, plaintiffs may recover their "pecuniary loss" caused by the abuse of process.   Restatement (First) of Torts § 682. Here, Josephs's pecuniary loss was the costs she incurred vacating the restraining order so that she could continue seeking repayment of the debts she was owed.   Minnesota courts have found awarding attorney fees and costs to plaintiffs appropriate in abuse of process cases.   *See, e.g.*, *Winnick v. Chisago Cnty. Bd. of Comm'rs*, 389 N.W.2d 546, 549 (Minn. Ct. App. 1986); *Dollar Travel Agency, Inc. v. Nw. Airlines, Inc.*, 354 N.W.2d 880, 883 (Minn. Ct. App. 1984).   Therefore, the Court will award Josephs her costs including reasonable attorney fees in responding to the restraining order.

Josephs has provided an affidavit and documentation demonstrating the costs and fees she has incurred both in connection with this case and responding to the restraining order for the abuse of process claim.   (Forsgren Decl. ¶¶ 3–12, Exs. 1–3.)   This filing includes names, credentials, hours spent, descriptions of the activities, and a breakdown of the costs incurred.   (*Id.*)   This documentation is sufficient to support the reasonableness of the costs and fees.   *See United HealthCare Corp. v. Am. Trade Ins. Co.*, 88 F.3d 563, 575

(8th Cir. 1996); *FMC Corp. v. Varonos*, 892 F.2d 1308, 1317 (7th Cir. 1990).  The hourly rates are consistent with common rates in the relevant market and the hours expended are reasonable to the issues raised, types of claims involved, and successful results both in this case and in responding to the restraining order.  RICO claims are complex and difficult cases that require expertise and specificity that can increase costs.  Considering these circumstances and the documentation provided, the $58,284.50 Josephs has incurred in this case is reasonable.  While expending $125,442.60 responding to a restraining order may seem unreasonable at first glance, lifting the order entailed an evidentiary hearing involving multiple witnesses and discovery disputes including two discovery conferences.  Under these circumstances and as documented, these costs appear to be reasonable.  Therefore, the Court will award Josephs $58,284.50 for Counts I and III and $125,442.60 for Count V in reasonable attorney fees and costs against Marzan alone.

## III.    EQUITABLE RELIEF

In addition to monetary damages, Josephs seeks prospective equitable relief pursuant to 18 U.S.C. § 1964(a).  Josephs requests that the Court (1) order Marzan to divest himself of any interest in PMG and Jupiter Rising Film; (2) prohibit Marzan from launching any future start-ups; and (3) require Marzan to disclose his history of criminal fraud, a copy of the Complaint in this case, the Motion for Default Judgment, and this Order to investors, potential business partners, and potential employees or contractors of any entity or business in which Marzan is involved.  (Compl. at 23; Mem. Supp. Mot.

Default J. at 29.)  Because RICO allows private plaintiffs to obtain equitable relief, Josephs

has standing to receive the relief she seeks, and granting equitable relief here will serve

the purposes of RICO's equitable relief and private plaintiff provisions, the Court will grant

equitable relief and impose various restrictions on Marzan to dismantle the RICO

enterprise.

### A.    Availability of Equitable Relief to Private Plaintiffs

The Court must first determine whether equitable relief is available to private RICO

plaintiffs like Josephs as a court cannot award relief it lacks the power to award to a

particular plaintiff.  The circuit courts who have addressed whether equitable relief is

available to private plaintiffs are split.  *Compare Chevron Corp. v. Donziger*, 833 F.3d 74,

137 (2d Cir. 2016) (holding that equitable relief is available to private plaintiffs); *Nat'l Org.*

*For Women, Inc. v. Scheidler*, 267 F.3d 687, 695 (7th Cir. 2001), *rev'd on other grounds*, 537

U.S. 393 (2003) (same), *with Hengle v. Treppa*, 19 F.4th 324, 356 (4th Cir. 2021) (holding

that equitable relief is not available to private plaintiffs); *Religious Tech. Ctr. v.*

*Wollersheim*, 796 F.2d 1076, 1088 (9th Cir. 1986) (same).[6]  The Supreme Court has not

answered this question.  *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 354 n.13 (2016)

_____

[6] Other circuits have addressed but left unresolved whether equitable relief is available to private plaintiffs again.  The First and Third Circuits have noted the split but expressed no opinion on the issue.  See *Lincoln House, Inc. v. Dupre*, 903 F.2d 845, 848 (1st Cir. 1990); *Northeast Women's Ctr., Inc. v. McMonagle*, 868 F.2d 1342, 1355 (3d Cir. 1989).  The Fourth and Fifth Circuits have expressed doubt that equitable relief is available to private plaintiffs.  *See Johnson v. Collins Ent. Co.*, 199 F.3d 710, 726 (4th Cir. 1999); *In re Fredeman Litig.*, 843 F.2d 821, 829–30 (5th Cir. 1988)

("This Court has never decided whether equitable relief is available to private RICO plaintiffs . . . and we express no opinion on the issue today."). The Eighth Circuit has also not answered this question. *Bennett v. Berg*, 685 F.2d 1053, 1064 (8th Cir. 1982) (declining to decide whether equitable remedies are available to private RICO plaintiffs).[7]

A civil cause of action for RICO violations is created in 18 U.S.C. § 1964 which also describes the civil remedies available. "[A]s with any question of statutory interpretation, the court begins its analysis with the plain language of the statute." *Owner-Operator Indep. Drivers Ass'n, Inc. v. Supervalu, Inc.*, 651 F.3d 857, 862 (8th Cir. 2011)

The relevant part of RICO's civil remedies section provides:

> (a) **The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962** of this chapter **by issuing appropriate orders**, including, but not limited to: **ordering any person to divest himself of any interest**, direct or indirect, in any enterprise; **imposing reasonable restrictions on the future activities** or investments of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce; or **ordering dissolution or reorganization of any enterprise**, making due provision for the rights of innocent persons.
>
> (b) **The Attorney General may institute proceedings under this section. Pending final determination thereof, the court may at any time enter such restraining orders or**

---

[7] On rehearing en banc of *Bennett*, one member of the en banc court would have found that equitable relief is available to private plaintiffs. *Bennett v. Berg*, 710 F.2d 1361, 1365 (8th Cir. 1983) (en banc) (McMillan, J. concurring in part and dissenting in part). The rest of the en banc court did not address the issue.

**prohibitions**, or take such other actions . . . as it shall deem proper.

(c) **Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee** . . . .

18 U.S.C. § 1964 (emphasis added)

Subsection (a) gives district courts the power to issue injunctive relief to prevent and restrain activities that are unlawful under 18 U.S.C. § 1962 in civil RICO cases. Crucially, it does not limit who may obtain such relief or in whose favor courts may exercise this grant of power. Therefore, absent language elsewhere in the statute limiting who may obtain this relief, the most natural reading of subsection (a) is that the injunctive relief the subsection authorizes is available to all civil RICO plaintiffs.

Subsections (b) and (c) specifically authorize two types of civil RICO plaintiffs: the United States and "any person injured in his business or property by" a RICO violation.

Subsections (b) and (c) also authorize additional types of relief and place limits on who is authorized to obtain these additional types of relief. After authorizing the United States to file a civil RICO claim, subsection (b) provides that "[p]ending final determination" of the suit, "the court may . . . enter such restraining orders or prohibitions . . . as it shall deem proper." In other words, the United States is able seek interim equitable relief.

-19-

This sentence granting the United States the ability to seek interim relief also has the effect of limiting the availability of this relief to the United States.  This is so because otherwise this sentence in subsection (b) would be superfluous.  "A preliminary injunction is always appropriate to grant intermediate relief of the same character as that which may be granted finally." *De Beers Consol. Mines v. United States*, 325 U.S. 212, 220 (1945); *see also Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 326 (1999) (analyzing and applying *De Beers*).  Therefore, if subsection (a) remedies are available to the United States—something no court has rejected—and subsection (a)'s equitable remedies are available only to the United States, the second sentence of subsection (b) would be superfluous because the United States would already be able to seek interim equitable relief if it sought equitable relief as a final remedy.  The only interpretation of § 1964 that gives meaning to all of § 1964's text including the second sentence of subsection (b) then is that subsection (a)'s permanent equitable remedies are available to all plaintiffs including private plaintiffs, but interim relief is only available to the United States.  "[T]he canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme."  *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013).  Because any other interpretation would render part of § 1964 superfluous, the most natural reading of the text allows private plaintiffs to seek equitable remedies.

The conclusion that permanent equitable relief but not interim relief is available to private plaintiffs is further supported by comparing the structures of subsections (b) and (c). Both subsections begin by granting the ability to file civil RICO cases to certain parties and then provide specific remedies only available to each type of plaintiff. Subsection (b) gives the United States the ability to seek interim equitable relief whereas subsection (c) gives private plaintiffs the ability to seek treble damages and attorney fees. To date, no court has found that the United States can seek treble damages and attorney fees suggesting that this should be seen as a grant to private plaintiffs and a limitation on the United States. *See, e.g.*, *Donziger*, 833 F.3d at 138.

Thus, three reasons demonstrate that that the most natural reading of § 1964's unambiguous text allows private plaintiffs to seek permanent § 1964(a)'s equitable remedies. First, subsection (a) itself places no limitation on which plaintiffs can seek the equitable relief provided there, instead expansively giving courts the power to grant such relief. Second, reading the second sentence of subsection (b) as a limitation on who can seek just interim equitable remedies while allowing private plaintiffs to seek final equitable remedies eliminates surplusage from § 1964. Third, this reading also allows subsections (b) and (c) to have a consistent structure. In sum, § 1964 begins with a broad grant of power without limitation and nothing else in the statute limits who may obtain final equitable relief in contrast to the limits the statute places on interim equitable relief, treble damages, and attorney fees.

-21-

Allowing private plaintiffs to seek the equitable remedies in subsection (a) is also in keeping Congress's express intent that the "provisions of [the RICO Act] shall be liberally construed to effectuate its remedial purposes." Pub. L. 91-452, § 904(a), 84 Stat. 947 (1970). Congress's purpose in passing RICO was to eradicate organized crime "by providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime." Pub. L. 91-452, Statement of Findings and Purpose, 84 Stat. 923 (1970). With RICO, Congress intended to "encourag[e] civil litigation not merely to compensate victims but also to turn them into private attorneys general, supplementing Government efforts by undertaking litigation in the public good." *Rotella v. Wood*, 528 U.S. 549, 550 (2000). "Indeed, if Congress' liberal-construction mandate is to be applied anywhere, it is in § 1964, where RICO's remedial purposes are most evident." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 491 n.10 (1985). Allowing a private plaintiff to obtain equitable relief that dismantles a RICO enterprise and imposes restrictions on a person's future activities will enable victims to best undertake litigation in the public good. The availability of treble damages provides a strong deterrent effect and encourages injured parties to bring civil RICO cases to redress past harms; wider availability of permanent injunctions increases the likelihood of preventing future violations of § 1962—the main purpose of RICO.

The courts that have held that equitable relief is not available to private plaintiffs rely primarily on three arguments: (1) a text-based argument that § 1964(b)'s mention of

interim equitable relief allows the United States alone to obtain § 1964(a)'s permanent

equitable because § 1964(c) lacks a similar mention; (2) the pre- and post-legislative

history of RICO's enactment; and (3) a comparison to the Clayton Act. *See, e.g.*, *Hengle*,

19 F.4th at 353–56 (applying (1) and (3)); *Wollersheim*, 796 F.2d at 1084–87 (applying all

three).

The Court finds the first argument unpersuasive. As discussed above, it would

render the interim relief provision of § 1964(b) superfluous as even without this clause,

the United States could seek interim relief under § 1964(a). The United States gets its

ability to seek permanent equitable remedies from § 1964(a), not § 1964(b) which only

references interim relief. This argument would also render the interim relief clause a

mere clarification, but if the clause did not exist, the Court would still find that the United

States could seek interim relief based on § 1964(a) and there would be no need for this

clarification. *Cf. Young v. United Parcel Serv., Inc.*, 135 S. Ct. 1338, 1352–53 (2015)

(refusing to adopt an interpretation of a statute that would render part of the text an

unnecessary clarification). It also does not fit with the overall structure of § 1964 which

begins with a broad grant of power that does not limit who may seek equitable relief

before defining two types of plaintiffs and specifies additional remedies available to each

type of plaintiff in subsections (b) and (c).

The Court also finds the second argument relying on legislative history

unpersuasive. While legislative history can be a useful tool of statutory interpretation in

many cases, its application here is not particularly useful.  First, courts typically look to legislative history and other sources if the statutory language is ambiguous.  *See, e.g.*, *United States v. Smith*, 171 F.3d 617, 620 (8th Cir. 1999).  Because the Court finds that the plain meaning of the statute is not ambiguous, the legislative history is of much less value especially because there is no "'clearly expressed intent to the contrary' that would warrant a different construction" in the legislative history.  *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 261 (1994) (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 177 (1993)).  Second, the legislative history itself is ambiguous.  *See Scheidler*, 267 F.3d at 699 (discussing RICO's conflicting legislative history on equitable relief); *Wollersheim*, 796 F.2d at 1084–86 (recognizing RICO's conflicting legislative history while still concluding that legislative history supported limiting the availability of equitable relief).  Moreover, a part of the history this argument relies on is Congress's failure to expressly expand RICO's civil remedies **after** enacting RICO.  *See Wollersheim*, 796 F.2d at 1086 (discussing Congressional inaction after RICO's enactment).  Post-enactment legislative history and rejected legislative action is rarely a reliable basis for statutory interpretation.  *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011); *see also Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 187 (1994) (noting that inaction may indicate "that the existing legislation already incorporated the offered change").  The legislative history here cannot overcome the unambiguous meaning of the statute.

The third common argument comparing RICO to the Clayton Act is also unpersuasive because it too points in different directions.  Congress modeled RICO's civil enforcement mechanisms contained in § 1964 after the Clayton Antitrust Act civil enforcement mechanisms.  *See Holmes v. Sec. Inv. Prot. Corp.,* 503 U.S. 258, 267 (1992). Unlike RICO, the Clayton Act's civil enforcement mechanism is spread out over three code sections: 15 U.S.C. §§ 4, 15, 26.  Section 4 authorizes the United States to file antitrust cases that seek equitable relief.  Section 15 authorizes private parties to file cases and allows for treble damages and recovery of attorney fees.  Section 26 specifically authorizes injunctive relief for private parties.  Section 26 was included in the Clayton Act that passed in 1914 to fill a gap in the previously enacted Sherman Antitrust Act that only authorized the United States to seek equitable relief.  *California v. Am. Stores Co.*, 495 U.S. 271, 285–87 (1990).  There are thus two reasonable but conflicting ways to interpret this history as applied to RICO.  On the one hand, the fact that, unlike the Clayton Act which specifically authorizes private parties to seek equitable relief in 15 U.S.C. § 26 and meant to fill a gap, RICO does not have explicit language authorizing it and filling the gap could mean that the gap is unfilled.  *See Hengle*, 19 F.4th at 356 (embracing the unfilled gap approach).  On the other hand, because the Supreme Court regularly treats the remedial provisions of RICO and the Clayton Act identically and the Supreme Court has already determined that private parties can obtain injunctive relief under the Clayton Act, the same interpretation could apply to RICO even though RICO consolidates its civil

remedial provisions into one section while the Clayton Act spread them out. *Scheidler*, 267 F.3d at 700 (embracing the same interpretation approach). There is an additional inference supporting the same interpretation approach. The Clayton Act specifically added equitable relief as an option for private litigants to existing antitrust law whereas RICO created civil remedies for both the United States and private parties at the same time for an entirely new type of law. So, RICO could be interpreted as consolidating the remedies into one section without needing a separate gap filling section because it never had the gap to begin with. Much like the specific legislative history of RICO, a comparison to the Clayton Act at a minimum does not overcome and may support the Court's interpretation of the statute's plain language.

The plain language of 18 U.S.C. § 1964 combined with RICO's express purpose to dismantle criminal enterprises demonstrates that private RICO plaintiffs are authorized to seek prospective injunctive relief. The Court must now decide whether to grant it here.

## B.     Standing to Receive Equitable Relief

Next the Court must determine whether Josephs has standing to request the equitable relief she seeks. Courts have an obligation to ensure litigants have standing even if the parties themselves do not raise the issue. *Frank v. Gaos*, 139 S. Ct. 1041, 1046 (2019); *Warth v. Seldin*, 422 U.S. 490, 499 (1975) (noting that standing "is the threshold question in every federal case").

Article III of the Constitution limits the jurisdiction of federal courts to deciding cases and controversies. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559 (1992). Standing is essential to the case-or-controversy requirement. *Id.* at 560. "[S]tanding is not dispensed in gross." *Lewis v. Casey*, 518 U.S. 343, 385 n.6 (1996). Instead, "a plaintiff must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000); *Digital Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 956 (8th Cir. 2015). Even if a plaintiff has standing for a damages claim, the plaintiff may not be able to pursue injunctive relief. *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983). To establish standing, a plaintiff must show (1) that it suffered a concrete and particularized injury in fact that is actual or imminent; (2) a causal connection between the injury and the defendant's conduct; and (3) that it is likely the plaintiff's injury will be redressed by the remedy. *Lujan*, 504 U.S. at 560–61.

Josephs easily meets the first two standing requirements. The uncontested facts establish that Josephs has suffered a concrete and particularized injury caused by Marzan's conduct: his uncontested actions defrauded Josephs and breached their contracts causing her to lose a substantial amount of money. Josephs also easily meets the redressability requirement for the monetary damages—including RICO treble damages—she seeks. It is, however, a closer question whether Josephs meets the redressability requirement for the equitable relief.

In *Lyons*, the Supreme Court held that although a plaintiff had standing to seek monetary damages after being placed in a chokehold under an allegedly impermissible Los Angeles Police Department chokehold policy, the plaintiff lacked standing to seek an injunction against future enforcement of the chokehold because he did not credibly allege that he faced a realistic probability that he would be choked as a result of the policy in the future. *Lyons*, 461 U.S. at 106, 106 n.7. An award of damages would redress the previous chokehold, but the Court found that it was no more than speculation that the injunction would prevent a future injury to the plaintiff even if it was certain that someone else might be the victim of an unconstitutional chokehold. *Id.* at 108. Instead, a plaintiff must show that the plaintiff "personally would benefit in a tangible way from the court's intervention." *Warth*, 422 U.S. at 508.

Josephs argues that equitable relief would redress her injury by making it much more likely that she recovers the money she is owed by both PMG and Marzan. It will increase the likelihood that PMG will pay her, she asserts, because PMG is a potentially viable for-profit company that has partnerships with large, legitimate entities and removing Marzan from his role in PMG increases the likelihood it will develop into a successful entity capable of paying the debts it owes including to Josephs. As for Marzan, Josephs argues that the equitable relief will make it more likely that she can recover from Marzan by making it more difficult for him to hide his assets and income.

Josephs has standing to seek equitable relief.  As Josephs admits, it is highly unlikely that she will loan money to or invest in Marzan or PMG again, indeed probably less likely than the risk that the plaintiff in *Lyons* would be placed in a police chokehold again and if she were to that would be entirely her own decision.  *Lyons* is still inapposite here.  An injunction against the city of Los Angeles would not have increased the likelihood of the plaintiff recovering monetary damages from the city.  Cities have routine practices for paying judgments against them and have income streams and fixed assets that a judgment holder can seek recovery against.  And even if Los Angeles did not have these things, blocking a chokehold policy would still not have increased the ability of the plaintiff to recover.  Here, Josephs sufficiently alleges that equitable relief both increases the likelihood that PMG is financially successful and decreases the likelihood that Marzan is able to hide his assets and income in the future—substantially increasing the likelihood that Josephs recovers at least some of her damages.  This case is thus more akin to *Friends of the Earth*, where the Supreme Court held that a private plaintiff had standing to seek civil penalties even though that money would go to the government because the civil penalties "made it likely, as opposed to merely speculative, that the penalties would redress [plaintiff's] injuries."  528 U.S. at 187.  So too here.  Even though the direct benefit of the equitable relief will go to others, equitable relief here makes it more likely the monetary damages will redress Josephs's injuries.  Just like in *Friends of the Earth*, the

-29-

actual imposition of statutorily available remedies rather than just their availability is likely to deter future RICO violations. *See id.* at 186.

This conclusion is bolstered by the core concerns that standing doctrine is meant to address. Josephs does not ask for an advisory opinion here as the uncontested facts demonstrate that she has been concretely harmed and is seeking to address that harm. *Hawse v. Page*, 7 F.4th 685, 694 (8th Cir. 2021) ("The doctrine[] of standing . . . , properly applied, ensure[s] that federal courts will decide only concrete disputes and will refrain from publishing advisory opinions or judicial essays on issues of the day.") She has also demonstrated that she is adverse to PMG and Marzan with a sufficient personal stake to illuminate all issues before the Court. *See Flast v. Cohen*, 392 U.S. 83, 99 (1968) ("The 'gist of the question of standing' is whether the party seeking relief has 'alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.'" (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962))).

Although it is not certain that even with the statutorily authorized equitable relief Josephs will recover all the damages awarded, it is far more likely that such relief will allow Josephs to redress her injuries at least in part. Thus, Josephs has standing to seek equitable relief as she will personally benefit in a tangible way from the Court's intervention. *See Warth*, 422 U.S. at 508.

C.    **Structuring Equitable Relief**

Because the Court finds that RICO's civil equitable relief is available to private plaintiffs and Josephs has standing to seek it, the Court must now decide whether to grant it and if so, how to structure the relief.

The Court will grant equitable relief.  Congress explicitly intended to provide new remedies to deal with unlawful activities in order to eradicate them.  18 U.S.C. § 1964(a) itself is meant to "prevent and restrain violations" of 18 U.S.C. § 1962.  The undisputed facts establish that Marzan has developed a pattern of violating 18 U.S.C. § 1962 over several years and may continue doing so through PMG and Jupiter Rising Film. Implementing the relief requested here would fill the prosecutorial gaps and help eliminate illegal activity as Congress intended.  *See Sedima*, 473 U.S. at 493; *Rotella*, 828 U.S. at 557.

The Court's decision to grant equitable relief here should not be seen as permitting equitable relief in any case where a plaintiff who is requesting monetary damages can prove that the defendant may be unlikely to pay without equitable relief through the Court's traditional equitable powers.  *See Califano v. Yamasaki*, 442 U.S. 682, 705 (1979) ("[F]ederal courts retain their equitable power to issue injunctions in suits over which they have jurisdiction.").  Three conditions make this the rare case where it is appropriate to do so.  First, the plaintiff is seeking relief under a statute that explicitly empowers this type of relief with the specific purpose of addressing the types of activity the defendant

is engaged in.  Second, the plaintiff has demonstrated that the defendant has organized his life to avoid his court-ordered obligations.  It appears that Marzan has created an enterprise designed to skirt damages awards and is using the enterprise to intentionally evade recovery by the same people and entities harmed by the enterprise.  By using corporate entities and investors to pay for his lifestyle, judgment holders are unable to recover court-ordered damages because they cannot attach judgments to any assets or income in his name.  Marzan has thumbed his nose at the judicial system by leaving a string of default judgments and unpaid damages awards in his wake even when courts grant him leniency in hopes that such leniency will allow him to pay his victims.  Instead, the undisputed facts show that he takes advantage of this leniency to find a new victim. Equitable relief is appropriate when defendants take advantage of the law to shield themselves from accountability at law.  *See Gingras v. Think Fin., Inc.*, 922 F.3d 112, 128 (2d Cir. 2019), *cert. denied sub nom. Sequoia Cap. Operations, LLC v. Gingras*, 140 S. Ct. 856 (2020).  Third, the plaintiff has credibly shown that the relief will increase the chances that multiple defendants including a defendant not subject to the equitable relief will pay the monetary damages awarded.

When structuring equitable relief here, the Court is mindful of the conditions leading to this rare circumstance, RICO's purpose, and Joseph's standing to seek this relief and will structure the relief to best conform with these issues.  The Court will order the following equitable relief pursuant to § 1964(a):

- Marzan must immediately divest himself of any interest, direct or indirect, in PMG and Jupiter Rising Film;

- Marzan must immediately cease all management, control, employment, and involvement with PMG and Jupiter Rising Film except to the extent necessary to provide remaining owners, managers, and employees with information and property necessary to continue the operation of the entities which Marzan must handover within 7 days of receiving this Order;

- Upon issuance of this Order, Marzan must not remove any assets from PMG and Jupiter Rising Film including but not limited to intellectual property, proprietary information, physical property, or financial assets including those Marzan believes to be his personal property.  To the extent that that Marzan asserts something in the control of PMG or Jupiter Rising Film is his personal property, Marzan may provide evidence of his ownership to the Court which will then adjudicate the proper titleholder of the property;[8]

- Marzan must—without being asked—disclose his 2014 guilty plea to insurance fraud in the State of Minnesota[9] and provide (1) a copy of the

---

[8] This provision protects the rights of innocent persons and entities involved with PMG and Jupiter Rising Film under 18 U.S.C. § 1964(a).

[9] The Court will not require Marzan to directly disclose his charge of Theft By Swindle in Minnesota State Court Case Number 82-CR-14-2262 as it was continued for dismissal.  *See* Sentencing Order, *State of Minnesota v. Alberto Jose Marzan*, Case No. 82-CR-14-2262 (Minn. Dist. Ct. Aug. 20, 2018).  The facts of the case will still be available to those receiving disclosures because the Complaint in this case must be provided.

Complaint in this case, (2) Josephs' Motion for Default Judgment and the initial accompanying memorandum, declaration, and exhibits filed in support of the motion,[10] and (3) this Order to:

1. Any potential or actual investor in any entity in which Marzan is involved in the entity's finances, operation, management, and/or control;

2. Any potential or actual business in any entity in which Marzan is involved in the entity's finances, operation, management, and/or control; and

3. Any potential or actual employees or contractors of any entity in which Marzan is involved in the entity's finances, operation, management, and/or control;

- Marzan may not form any entity including but not limited to a corporation, limited liability company, or partnership without first obtaining permission from the Court;

- Josephs must provide notice to the Court within 28 days of satisfaction of her judgment against PMG; and

---

[10] Marzan need not disclose the supplemental briefing and documentation Josephs provided at the Court's request.  To be clear, in addition to the Complaint and this Order, Marzan must disclose Docket Numbers 10, 12, and 13 including all exhibits attached to Docket Number 13.

- Josephs must provide notice to the Court within 28 days of satisfaction of her judgment against Marzan.

This relief will prevent and restrain future violations by Marzan's RICO enterprise while protecting innocent investors, owners, managers, and employees of PMG and Jupiter Rising.  It will also prevent and restrain future violations by protecting innocent investors, employees, and contractors who would otherwise be unaware of the existence of the RICO enterprise.  By preventing and restraining future violations, this relief is the type of conduct RICO's § 1964(a) equitable remedies are directed toward eradicating.  It also increases the likelihood that Josephs will be able to recover her damages from PMG and Marzan.  By requiring Josephs to report the future satisfaction of her judgments to the Court, the Court will be able to relieve Marzan of the equitable relief if the Court determines Josephs no longer has standing for the equitable relief granted.

To be clear, this Order will not require Marzan to make the disclosures to any entity, owner, or investor of any company in which he is an employee without any management or control over the company and is without any role in the company's finances or operations.  Marzan is encouraged to seek clarification from the Court if he is uncertain of these requirements now or if at any time in the future when he is considering his role in a company.  Marzan may also request the Court terminate the equitable relief or grant an alteration to or an exception from this Order but must do so before taking any action that would violate the terms of this Order.

**CONCLUSION**

The undisputed facts adequately establish that Marzan and PMG are jointly and severally liable to Josephs for fraudulent representation and breach of contract and that Marzan alone is liable to Josephs for violation the RICO Act and abuse of process. Therefore, the Court will grant Josephs's Motion for Default Judgment.  The Court will award Josephs monetary damages against PMG and Marzan associated with the losses she has demonstrated on the record including interest on the promissory notes against both Defendants and including treble damages and attorney fees against Marzan as authorized by RICO.  The Court will also grant Josephs equitable relief against Marzan to prevent and restrain future RICO Act violations because such relief is available to private plaintiffs and Josephs has standing to request it.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Plaintiff's Motion for Default Judgment [Docket No. 10] is **GRANTED IN PART and DENIED IN PART** as follows:

1. Alberto Jose Marzan is liable to Michaleen Josephs for violation of the Racketeer Influenced and Corrupt Organizations Act (Count I), fraudulent misrepresentation (Count II), breach of contract (Count III), and abuse of process (Count V).

2. Press Media Group, Inc. is liable to Michaleen Josephs for fraudulent misrepresentation (Count II) and breach of contract (Count III).

3.  The motion for default judgment against Alberto Jose Marzan and Press Media Group, Inc. for promissory estoppel (Count IV) is **DENIED** as moot.

4.  Michaleen Josephs is awarded $266,233.36, plus accrued interest on the promissory notes of not less than $31,521.73 as of December 20, 2021, with interest continuing to accrue at a rate of $46.63 per day until the date of judgment, against Alberto Jose Marzan and Press Media Group, Inc., jointly and severally.

5.  Michaleen Josephs is awarded treble damages for Count I under 18 U.S.C. § 1964(c) in the amount of $532,466.72, plus not less than $63,043.45 representing treble damages on accrued interest as of December 20, 2021, with damages continuing to accrue at a rate of $93.26 per day until the date of judgment, against Alberto Jose Marzan.

6.  Michaleen Josephs is awarded $58,284.50 in additional damages against Alberto Jose Marzan, representing reasonable attorney fees and costs as authorized by 18 U.S.C. § 1964(c) against Alberto Jose Marzan, arising from Count I and as authorized by the personal guaranty contract, arising from Count III.

7.  Michaleen Josephs is awarded $46,092.19 in additional damages against Alberto Jose Marzan, arising from Counts II and III.

8.  Michaleen Josephs is awarded $125,442.60 in additional damages against Alberto Jose Marzan, arising from Count V.

9.  Pursuant to 18 U.S.C. § 1964(a), arising from Count I, until further order of this Court:

    a.  Alberto Jose Marzan must immediately divest himself of any interest, direct or indirect, in Defendant Press Media Group, Inc. d/b/a VumaTV and in Jupiter Rising Film;

    b.  Alberto Jose Marzan must immediately cease all management, control, employment, and involvement with Press Media Group, Inc. d/b/a VumaTV and Jupiter Rising Film except to the extent necessary to provide remaining owners, managers, and employees of these entities with information and property necessary to continue the operation of the entities;

    c.  Alberto Jose Marzan must handover all information and property relevant to the above section within seven (7) days of receiving this Order;

    d.  As of the date of this Order, Alberto Jose Marzan must not remove any assets from Press Media Group, Inc. d/b/a VumaTV and Jupiter Rising Film including but not limited to intellectual property, proprietary information, physical property, or financial assets including those Alberto Jose Marzan believes to be his personal property;

    e.  Alberto Jose Marzan may provide the Court with evidence of his personal ownership of any assets in the control of Press Media Group, Inc. or Jupiter Rising Film who will award title to the proper owner;

    f.  Albert Jose Marzan must promptly and without request disclose his 2014 guilty plea to insurance fraud in *State of Minnesota v. Alberto Jose Marzan*, Minnesota Case No. 82-CR-13-4853 and provide (1) a copy of the Complaint in this case [Docket No. 1], (2) Michaleen Josephs's Motion for Default Judgment [Docket No. 10.] and initial accompanying memorandum [Docket No. 12], declaration [Docket No. 13], and exhibits [attachments to Docket No. 13] filed in support of the Motion in this case, and (3) this Order to:

        i.  Any potential or investor in any entity in which Marzan is involved in the entity's finances, operation, management, and/or control;

        ii.  Any potential or actual business in any entity in which Marzan is involved in the entity's finances, operation, management, and/or control; and

        iii.  Any potential or actual employees or contractors of any entity in which Marzan is involved in the entity's finances, operation, management, and/or control;

    g.  Alberto Jose Marzan is enjoined from forming any entity including but not limited to a corporation, limited liability company, or partnership without explicit permission from the Court;

h.  Michaleen Josephs must provide notice to the Court within twenty-eight (28) days of satisfaction of the damages awarded in her favor against Press Media Group, Inc.; and

i.  Michaleen Josephs must provide notice to the Court within twenty-eight (28) days of satisfaction of the damages awarded in her favor against Alberto Jose Marzan.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:  January 5, 2022
at Minneapolis, Minnesota.

JOHN R. TUNHEIM
Chief Judge
United States District Court