# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

MICHALEEN JOSEPHS,

                              Plaintiff,

v.

ALBERTO JOSE MARZAN and PRESS
MEDIA GROUP, INC., *doing business
as VumaTV*,

                            Defendants.

Civil No. 21-749 (JRT/DTS)

**MEMORANDUM OPINION
REQUESTING PROSECUTION
FOR CRIMINAL CONTEMPT**

---

Caitlinrose H. Fisher and Matthew D. Forsgren, **FORSGREN FISHER MCCALMONT DEMAREA TYSVER LLP**, 225 South Sixth Street, Suite 1500, Minneapolis, MN 55402, for Plaintiff.

Defendant Alberto Marzan is a serial fraudster who has largely managed to dodge accountability for victimizing individuals in the entertainment industry. Plaintiff Michaleen Josephs brought this action against Marzan and his company, Press Media Group ("PMG"), after Marzan fraudulently induced Josephs to issue a series of bogus investments and other payments. When Marzan failed to respond, the Court entered default judgment for Josephs and awarded damages and equitable relief, including a requirement that Marzan divest from his enterprises and provide any future potential investors, employees, or business associates with copies of the Court's default judgment order and his 2014 guilty plea for insurance fraud. Since then, Marzan has continued to defraud others using the same businesses and has not complied with the Court's

disclosure orders, all while expressing his knowledge of, and disdain for, the Court's order. The Court will ask the United States Department of Justice to prosecute Marzan for criminal contempt.

## BACKGROUND

### I.   UNDERLYING CONDUCT AND ORDER

Marzan fraudulently induced Josephs to lend him and his business, PMG, more than $250,000, which he never repaid.  (Mem. Op. & Order Granting Default J. ("Order") at 12–13, Jan. 5, 2022, Docket No. 22.)  Josephs also rented and furnished an apartment for Marzan based on his promise to repay her, incurring nearly $50,000 in additional expenses.  (*Id.* at 13–14.)  Marzan's fraud was nothing new: Josephs later discovered Marzan's prior convictions for insurance and investment fraud and eight unpaid default judgments for which Marzan was responsible.  (*Id.* at 3.)

Josephs filed a complaint for violations of the Racketeering Influenced and Corrupt Organizations Act ("RICO") predicated on mail and wire fraud, fraud, breach of contract, promissory estoppel, and abuse of process.  (Compl. ¶¶ 141–71, Mar. 22, 2021, Docket No. 1.)  Josephs served Marzan but he did not appear.  (Order at 6.)  The Court ordered default judgment for Josephs and awarded her over $800,000 in damages, interest, and attorney's fees.  (Order at 36–37.)

The Court also entered an injunction requiring Marzan to (1) divest himself of any interest and involvement in PMG and his other business, Jupiter Rising; (2) disclose, without prompting, his 2014 guilty plea to insurance fraud and the complaint, motion,

and order in this case to actual or potential investors, businesses, employees, or contractors ("the disclosures"); and (3) prohibited Marzan from forming new business entities without the Court's permission. (*Id.* at 38–39.)  The Court encouraged Marzan to seek clarification if he was unsure of his obligations under the order. (*Id.* at 35.)  It also informed Marzan that he could "request the Court terminate the equitable relief or grant an alteration to or an exception from this Order but must do so before taking any action that would violate the terms of this Order." (*Id.*)

The Court entered the injunction after considering the statutory and constitutional propriety of equitable relief.  As to Article III standing, the Court focused on whether the injunction was likely to redress Josephs's injuries. (*Id.* at 27.)  Both Josephs and the Court admitted that it was unlikely Josephs would loan money to or invest in Marzan or PMG again. (*Id.* at 29.)  Nonetheless, the Court concluded that the injunction would "increase[] the likelihood that PMG is financially successful and decrease[] the likelihood that Marzan is able to hide his assets and income in the future—substantially increasing the likelihood that Josephs recovers at least some of her damages." (*Id.*)[1]  The Court observed that:

> the defendant has organized his life to avoid his court-ordered obligations.  It appears that Marzan has created an enterprise designed to skirt damages awards and is using the enterprise to intentionally evade recovery by the same people and entities harmed by the enterprise.  By using corporate entities

---

[1] The Court has some lingering questions about standing in light of those harmed over the past two years.  Although Marzan has violated the Court's order, his violations have injured others, not Josephs.  Nonetheless, the propriety of the injunction has no bearing on contempt. *See United States v. United Mine Workers of Am.* 330 U.S. 258, 293–94 (1947).

and investors to pay for his lifestyle, judgment holders are
unable to recover court-ordered damages because they
cannot attach judgments to any assets or income in his name.
Marzan has thumbed his nose at the judicial system by leaving
a string of default judgments and unpaid damages awards in
his wake even when courts grant him leniency in hopes that
such leniency will allow him to pay his victims.  Instead, the
undisputed facts show that he takes advantage of this
leniency to find a new victim.  Equitable relief is appropriate
when defendants take advantage of the law to shield
themselves from accountability at law.

(*Id.* at 32.)

## II.    VIOLATIONS

Marzan continues to defraud employees and contractors from a business that the

Court ordered him to divest from and without issuing the required disclosures.  And he

has done so while making clear that he is aware of, but has no regard for, the Court's

order.

**Alexandra Weitzer.**   Weitzer and Marzan dated for approximately six months,

during which time Marzan employed Weitzer as a personal assistant and project manager

for himself and Jupiter Rising.  (Decl. Alexandra Weitzer ¶¶ 2, 8–9, May 16, 2024, Docket

No. 29.)  Marzan never paid Weitzer for her work nor reimbursed her, as promised, for

shared living expenses totaling over $20,000.  (*Id.* ¶¶ 16–17.)  Marzan never issued the

required disclosures, but eventually discussed this case with her and gave her a copy of a

letter written by an attorney explaining away the Court's default judgment order.  (*Id.*

¶¶ 3–4, 18–19.)  The letter proclaims that the Court's order was "without merit," "as

draconian a judgement [sic] as I have ever seen," and promises that efforts were underway to vacate the order under Rule 60. (*Id.*, Ex. A.) No such motion was ever filed.

**Dr. Niyi Coker.** Marzan asked Dr. Coker, a professor at San Diego State University, to partner with him on a film project. (Decl. Dr. Niyi Coker ¶¶ 1–2, May 16, 2024, Docket No. 30.) Marzan did not make the required disclosures. (*Id.* ¶ 7.) When Dr. Coker independently discovered this case and confronted Marzan, Marzan responded "I took the liberty of sharing the letter from my attorney with you as I have with others since learning about this bogus and unfounded matter. It will be vacated shortly since the contents and the manner in which it was obtained was not valid." (*Id.*, Ex. G.)

**Lindsey Lambert.** Marzan hired Lambert, a recent college graduate, to work as his personal assistant at Jupiter Rising without making the required disclosures. (Decl. Lindsey Lambert ¶¶ 3, 6–7, 27–28, Exs. A., D., May 16, 2024, Docket No. 31.) Shortly after Lambert relocated to San Diego for the job, Marzan insisted she cover hotel rooms and other expenses that he would reimburse. (*Id.* ¶ 14.) Marzan never compensated Lambert for her work nor reimbursed her expenses. (*Id.* ¶ 25.)

**Giancarlo Ruiz.** Marzan hired Ruiz to write and direct a television series for Jupiter Rising without making the required disclosures. (Decl. Giancarlo Ruiz ¶¶ 4, 13–14, May 16, 2024, Docket No. 32.) Marzan convinced Ruiz to provide his credit card for them to check in at a hotel while promising reimbursement. (*Id.* ¶ 6.) Ruiz was ultimately charged

over $4,000 for both his and Marzan's rooms, which he was never reimbursed for. (*Id.* ¶ 15.)  Nor was Ruiz paid for his work. (*Id.* ¶¶ 3, 9–11.)

**Galina Semenova.**  Marzan hired Semenova as an art show assistant for Jupiter Rising without making the required disclosures. (Decl. Galina Semenova ¶¶ 3, 31–32, May 16, 2024, Docket No. 33.)  Marzan never paid Semenova for her work, nor did he reimburse her for expenses incurred on his behalf. (*Id.* ¶¶ 28, 30.)  When Semenova independently learned of this case, Marzan tried to explain it away and showed her a slide deck that acknowledged he had received the Court's order. (*Id.* ¶¶ 33–34, Ex. K at 4.)

## III.    ORDER TO SHOW CAUSE

The Court ordered Marzan to appear at a hearing to show cause as to why he should not be held in contempt for violating the Court's default judgment order. (Show Cause Order, May 30, 2024, Docket No. 36.)  Although he had nearly two months' notice, Marzan did not appear.  Instead, Marzan left a voicemail with the Court on the morning of the hearing, claiming he needed additional time to secure counsel.

DISCUSSION

## I.    STANDARD OF REVIEW

"One of the overarching goals of a court's contempt power is to ensure that litigants do not anoint themselves with the power to adjudge the validity of orders to which they are subject." *Chicago Truck Drivers v. Bhd. Lab. Leasing*, 207 F.3d 500, 504 (8th Cir. 2000).  Contempt may be civil or criminal.  *See Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 838 (1994).

-6-

Civil contempt involves imprisonment or monetary sanctions that are designed to coerce the contemnor to comply with a court order or to compensate a litigant for damages caused by the contemnor's noncompliance. *Chicago Truck Drivers,* 207 F.3d at 505. "Imprisonment for a fixed term . . . is coercive when the contemnor is given the option of earlier release if he complies." *Bagwell*, 512 U.S. at 828. In other words, a contemnor carries "the keys of his prison in his own pocket." *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 442 (1911) (quotation omitted).

Criminal contempt, on the other hand, "is a crime in the ordinary sense." *Bloom v. Illinois*, 391 U.S. 194, 201 (1968); *see also* 18 U.S.C. § 401. The Court may use criminal contempt to enforce its mandates and protect the sanctity of the institutions of government. *Bloom*, 391 U.S. at 201. While the Court's criminal contempt power "must be restrained by the principle that only the least possible power adequate to the end proposed should be used in contempt cases," criminal contempt is appropriate when "the end is punishment of past behavior." *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 801 (1987) (cleaned up); *N.L.R.B v. A-Plus Roofing,* 39 F.3d 1410, 1418 (9th Cir. 1994). In initiating and punishing criminal contempt, the Court should consider "the extent of the willful and deliberate defiance of the court's order, the seriousness of the consequences of the contumacious behavior, the necessity of effectively terminating the defendant's defiance as required by the public interest, and the importance of deterring

such acts in the future." *United Mine Workers*, 330 U.S. at 303.  As with civil contempt, both incarceration and monetary sanctions are available.

"[A] private person, as informant, is not a proper party to a criminal contempt proceeding.  His only office in such a proceeding is served when he calls to the court's attention facts which may constitute criminal contempt." *Kienle v. Jewel Tea Co.*, 222 F.2d 98, 100 (7th Cir. 1955).  Thereafter, a court may request that the government prosecute the contemnor or appoint a prosecuting attorney should the government decline.  *See* Fed. R. Civ. P. 42(a)(2); *United States v. Arpaio*, 887 F.3d 979, 981 (9th Cir. 2018).[2]

## II.    ANALYSIS

Because the Court cannot let Marzan's blatant disregard for its order go unpunished and neither compensatory nor coercive civil contempt are appropriate, the Court will refer this case to the United States Attorney for a criminal contempt prosecution.

Compensatory civil contempt is easy to dispatch with.  Although individuals were swindled by Marzan and thus harmed by his noncompliance, Josephs was not.  She has not had a relationship with or lost money to Marzan since the Court entered its order.

---

[2] "In the great majority of cases the dedication of the executive branch to the preservation of respect for judicial authority makes the acceptance by the United States Attorney of the court's request to prosecute a mere formality."  Dep't of Justice, *Criminal Resource Manual* § 768 (2023), https://www.justice.gov/archives/jm/criminal-resource-manual-768-indirect-criminal-contempt -role-prosecutor.

Nor is the Court satisfied that this case calls for coercive civil contempt.  Fines would likely accomplish nothing, as Marzan habitually ignores monetary judgments.  And it is not clear how the Court could fashion a term of imprisonment in which Marzan would hold the keys to his cell.  Much of the Court's injunction requires Marzan to refrain from acting, and the benchmarks for compliance from prison would be fleeting at best.

Instead, the Court will ask the United States Attorney for the District of Minnesota to prosecute Marzan for criminal contempt, thus punishing him for past noncompliance.  Marzan's violations were willful and deliberate, undertaken in furtherance of additional fraudulent schemes, and demonstrate that he will not be deterred absent real consequences.  *See United Mine Workers*, 330 U.S. at 303.

The Court finds that Marzan's parading of the letter from Jupiter Rising's outside counsel is particularly appalling.[3]  It demonstrates that Marzan knew of the Court's order and the proper mechanisms to ask the Court to reconsider, but decided he would instead disobey the order while denigrating these proceedings.  *See Chicago Truck*, 207 F.3d at 504 (litigants must not be allowed to "anoint themselves with the power to adjudge the

---

[3] The Court will also alert the Minnesota Lawyers Professional Responsibility Board about the letter written by Aaron C. Young, Minnesota License Number 0316027.  Though the Court does not have enough information to pass judgment on Young's conduct (it is possible he, too, was swindled by Marzan), state regulators may wish to investigate whether Young violated Minnesota Rules of Professional Conduct 4.1, 8.4, and others by misrepresenting that he would file a motion for reconsideration and helping facilitate Marzan's fraudulent activities.  Because Young is not admitted to the Court's bar, the Court will not commence its own disciplinary investigation under Local Rule 83.6.

validity of orders to which they are subject."). Marzan was entitled to disagree with the Court's conclusions and ask the Court to reconsider. He was not entitled to take matters into his own hands by unilaterally deciding to disregard the Court's order.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, the Court requests, pursuant to Federal Rule of Criminal Procedure 42(a)(2), that the United States Department of Justice prosecute Defendant Alberto Jose Marzan for criminal contempt. The Clerk of Court shall transmit a copy of this Memorandum Opinion to the United States Attorney's Office for the District of Minnesota. The Clerk of Court shall also transmit a copy of this Memorandum Opinion and the Declaration of Alexandra Weitzer [Docket No. 29], including Exhibit A to that Declaration [Docket No. 29-1], to the Minnesota Lawyers Professional Responsibility Board for consideration of matters addressed in footnote 3 of the Memorandum Opinion.

DATED: August 22, 2024
at Minneapolis, Minnesota.

JOHN R. TUNHEIM
United States District Judge